SCOTT SMITH, *Plaintiff*
JANEL DONNELLEY, *Plaintiff*
458 NORTH NEW HAVEN STREET
MESA, ARIZONA 85205
Fax: (877) 916-6637

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF   IOWA

| | |
|---|---|
| SCOTT SMITH, a married man, <br> JANEL DONNELLEY, a married woman, <br><br> *Plaintiffs* <br><br> vs. <br><br> WELLS FARGO NATIONAL ASSOCIATION; <br> PREMIER FINANCIAL SERVICES INC; <br> JOHN DOES 1-50; JANE DOES 1-100 <br><br> *Defendants* | CASE NO.: <br><br> VERIFIED COMPLAINT <br><br><br> **RECEIVED** <br><br> MAY 1 7 2012 <br><br> CLERK U.S. DISTRICT COURT <br> SOUTHERN DISTRICT OF IOWA |

## COMPLAINT

**AND NOW COMES** the Plaintiffs Scott Smith and Janel Donnelley, and complains of the Defendants and alleges as follows:

1. Plaintiff Scott Smith and Janel Donnelley are the current owners of the subject property located at 458 North New Haven Street, Mesa Arizona 85205 (attached hereto as Exhibit A)

2. Defendant PREMIER FINANCIAL SERVICES INC (hereinafter referred to as "Lender") is the Lender of the subject Note with a principal place of business at 10115 E. Bell Road Suite 107-450, Scottsdale Arizona 85260. Upon information and belief defendant is no longer doing business in the state.

3. Defendant WELLS FARGO BANK NATIONAL ASSOCIATION (hereinafter "WELLS") is national bank chartered under the laws of the State of Indiana, and is a debt collector as defined by 15 U.S.C. § 1692 et seq.

4.   Any allegations about acts of any corporate or other business Defendants means that the corporation or other business did the alleged acts through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

5.   At all relevant times, each Defendant committed acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint; additionally some of the Defendants acted as the agent for other Defendants, and all of the Defendants acted within the scope of their agency as if acting as the agent of another.

6.   Knowing or realizing that other Defendants were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts.

7.   Each Defendant intended to and did encourage, facilitate or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

8.   All Defendants engaged in continuous and multiple unfair and deceptive trade practices, fraud and misrepresentations that affected interstate commerce and proximately caused the herein injuries to the Plaintiff.

## JURISDICTION AND VENUE

9.   Jurisdiction of this Court is under 28 U.S.C. § 1331, 1332, 12§USC§ 2601 et seq. (Real Estate Settlement Procedures Act); and 15 U.S.C. § 1692 et seq. (Fair Debt Collection Practices Act), and over the statutory and common-law violations of California and common law. Venue is proper in this court pursuant to Section 503 of the CPLR, as all Defendants are either domiciled in this County, or they regularly conduct business there and benefit and protection of Delaware law there.

10.   This court has jurisdiction pursuant to 28 USC§1441 as the amount of controversy exceeds $75,000. Venue is proper in this district because at least one of the defendants are incorporated within the State of Indiana.

## FACTUAL ALLEGATIONS

11.    On or about February 19, 2008, Scott Smith and Janel Donnelley executed a Promissory Note and Deed of Trust.  (See Exhibit A)

12.    The note was for $157,500.00 made payable to Premier Financial Services Inc.  A copy of the Note is attached hereto and incorporated herein and marked Exhibit "A".

13.    The Lender determined that the adjustable terms of the Note were to be based upon an 5.75% interest rate adjustable on a periodic basis to the "Index" of a "Twelve-Month Average" of the annual yields of United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates" and classified as the "Monthly Yields."

14.    The Twelve Month Average is determined by adding together the Monthly Yields for  the most recently available twelve months and dividing by twelve.  The most recent Index figure available 15 days before each Interest Rate Change Date is called the "Current Index."

15.    The margin of the Lender calculates new interest rates by adding not greater than 9.6% and not less than 8.1% Margin" to the Current Index.

16.    Paragraph 4(D) of the Note states "My interest rate will never be greater than 15.1%."

17.    As security for the aforementioned Note, on April 26, 2005, Plaintiff executed a Mortgage (hereinafter referred to as the "Mortgage") identifying, as lender, MERS as "nominee for Lender and Lender's successor's and assigns .... [and as a] beneficiary under [the instrument]. . ."

18.    Plaintiff's loan was immediately sold and securitized after closing by Countrywide Home Loans and placed into a Pooling and Servicing Agreement and converted into a stock of a Pass Through Vehicle.  The *mortgage title was never officially transferred to the trust* and as a result, the note was put out of eligibility for the trust under New York law.

19.     There is no evidence that Premier Financial Services endorsed the Note to anyone or that the Mortgage was properly assigned to the now purported holder-in-due-course Wells Fargo Bank National Association.

20.     If such assignment did occur and was legal, Plaintiffs were never notified of it pursuant to federal RESPA and TILA law.

21.     The alleged loan was nevertheless registered with the SEC as a Real Estate Mortgage Investment Conduit (REMIC) Trust and became a Special Purpose Vehicle (SPV) for the purpose of tax exemption.

22.     REMICs are investment vehicles that hold commercial and residential mortgages in trust and issues securities representing an undivided interest in these mortgages.

23.     A master servicer of the REMIC was appointed as was a Trustee, Defendant WELLS.

24.     Normally, the Trustee of a Trust has the power and responsibility to administer the assets of the Trust but in the case of a REMIC *no such power exists.*

25.     Once the REMIC containing Plaintiff's loan was formed, *the loan was converted into a security* owned by thousands of shareholders throughout the world and was traded on Wall Street.

26.     At that point, the state of Plaintiff's loan changed and was converted forevermore into a stock.

27.     Once Plaintiff's loan was securitized and converted, it forever lost its security.

28.     Since the loan was sold and securitized into stock, the lender can no longer claim that it is a real party in interest, or even that the loan stills exists as a loan, since double dipping is a form of securities fraud.

29.     A negotiable instrument can only be in one of two states after undergoing securitization, not both at the same time.  It can either be a loan or a stock.

30.     Once the instrument is traded as a stock, it is forever a stock and therefore regulated, as this loan was, by the SEC as a stock.

31.     A negotiable instrument can only be in one of two states after undergoing securitization, not both at the same time.  It can either be a loan or a stock.

32.     Once the instrument is traded as a stock, it is forever a stock and therefore regulated, as this loan was, by the SEC as a stock.

33.     A negotiable instrument can only be in one of two states after undergoing securitization, not both at the same time.  It can either be a loan or a stock.

34.     Once the instrument is traded as a stock, it is forever a stock and therefore regulated, as this loan was, by the SEC as a stock.

35.     The subject Mortgage states that the Mortgage secures the Promissory Note.

36.     The Promissory Note, by conversion into stock, was extinguished as a collateralized asset and therefore the Trust secures absolutely nothing and WELLS, not being the real party in interest, has no standing to foreclose on Plaintiff.

37.     Since the Lender sold the loan to a REMIC, it forever lost the ability to enforce, control or otherwise foreclose on Plaintiff's property, including the right to assign the Mortgage or endorse the Note.  It was no longer the real party of interest.

38.     If the WELLS owned the Note, it would have to be taxed on the interest earned from the Note.  If the REMIC owned the Note it would have a tax liability.

39.     To avoid double taxation, under Internal Revenue Code 860, the loan was put into a SPV, so that only the shareholders are taxed and therefore are the real parties in interest.

40.     Because of IRS code 860, the WELLS/Trustee is not the real and beneficial party in interest because the REMIC does not own the Note, *the shareholders do.*

41.     By distributing the tax liabilities to the shareholders, the REMIC has also distributed the parties in interest.

42.     Since a Promissory Note is only enforceable in its whole entirety and thousands of shareholders own the subject Note, no one of them can foreclose on Plaintiff's home.

43.     The asset of the REMIC was registered and traded as a part of a security and as such cannot be traded out and is permanently attached and converted into stock preventing the Note from being assigned and securitized again and again which would create securities fraud.

44.     Since Plaintiff's loan went into default, it was written off by the REMIC and received tax credits from the IRS, was therefore discharged, and settled destroying the Note forever.

45.     After securitization, the Note cannot be re-attached to the Mortgage through adhesion.

46.     Under the UCC, the Promissory Note is a one-of-a-kind instrument and any assignment must be as a permanent fixture onto the original Note much like a check.

47.     There is no endorsement on the original Note.

48.     The original Promissory Note has the only legally binding chain of title, otherwise the instrument is faulty.

49.     The original Note had to be destroyed upon securitization because the Note and the stock cannot exist at the same time.

50.     All Defendants lack standing to enforce the Note.

51.     Under the terms of the Pooling and Servicing Agreement, the servicer can buy back the Note as a non-performing non-secured debt like collection agencies that buy non-performing credit card debts.

52.     This purchase is of a *discharged asset* and cannot be re-adhered to the original Mortgage, since the original Note was a one-of-a-kind instrument, not part of the discharged asset.

53.     Therefore the purchaser of the discharged asset can never be the holder-in-due-course of the original Note.

54.     Under the UCC, the original Promissory Note is the only valid and legally binding chain of title for the Note.

55.    The numerous attempts by MERS, WELLS to claim ownership of the original Note by the purchaser of the discharged asset is fraudulent and is characterized as "reverse engineering."

56.    There is no perfection of title.

57.    Plaintiff's Note was unduly confusing and written in such a manner as to confuse Plaintiff and for the purpose of drawing Plaintiff into a default.

58.    Upon information and belief, MERS was established in or around 1993 by members of the mortgage banking industry so as to create a centralized document custodial system through which mortgages can be easily transferred between members without having to record or pay county filing fees for such assignments.

59.    Plaintiff never executed a note naming MERS as a party, nor was Plaintiff ever notified or informed of a transfer of the note to MERS.

60.    No evidence exists to support the claim that MERS is or was ever was the holder in due course of the Note at issue in this action.

61.    MERS, listed on the Mortgage as the "nominee" or agent, and as the one-time purported holder of the Note, by and through its membership rules, was not empowered to act as an agent or nominee for its members, and was without specific written approval from both principals and lacked the mandate to effectuate mortgage-related assignments, transfers or appointments of any kind.

62.    There is no evidence to suggest that during the relevant time periods contemplated in this Action, MERS was empowered by both principals to effectuate any mortgage-related assignment, transfer or appointment.

63.    On or about October 21, 2011 Tiffany& Bosco PA, executed a Notice of Trustee Sale (attached hereto as Exhibit B) which is materially false.

65.    On August 3, 2011 MERS caused to be filed an "Assignment" purportedly assigning the subject loan to WELLS (See Exhibit C). The Assignment from MERS is fraudulent and is fatally defective for several reasons;

      1. Premier Financial Services could not have gave MERS instructions to Assign its interest in the promissory note to WELLS on August 3, 2011 due to the fact that Premier did not own the subject loan, as Plaintiff loan was already sold to into a securitization pool.

      2. The Assignment is fraudulently simply because Premier Financial no longer existed as a business entity.

      3.    MERS could not have assigned Plaintiff promissory Note as MERS only owns legal title only. In fact MERS own rules prohibit assignment of promissory Notes, as it is known they never had possession of those Notes.

      4. Further WELLS could not be a Trustee pursuant to the Deed of Trust as it is not an Agent of MERS, and it does not have authority to act pursuant to the Pooling and Service agreement. For this reason alone, WELLS willfully is acting without standing and capacity.  WELLS does not act on behalf of the securitized Trust who is the true owner of the Plaintiff Note through the sale.

66.    Plaintiff were never informed or notified of any transfer of the Note to Defendant WELLS.

67.    The Mortgage states that only the Lender can make an assignment.

68.    No evidence exists to support the claim that WELLS, nor Premier Financial Services is the holder in due course of the Note at issue in this action.

69.    Plaintiff's mortgage was flawed from the date of origination of the loan because MERS was named as the beneficiary and nominee of the lender on the Mortgage, which was done for purposes of deception, fraud, confusing – and therefore harming – the Plaintiff, and theft of revenue from the local county government through the illegal avoidance of mortgage recording fees.

70.     MERS is unregistered and unlicensed to conduct mortgage lending or any other type of business in the State of Arizona and has been and continues to knowingly, intentionally, illegally and fraudulently record mortgages and conduct business in Pennsylvania on a large scale and systematic fashion.

74.     WELLS is not the original lender for the Plaintiff's subject Mortgage or Note herein.

75.     In October 2012, WELLS attempted to be a party in standing during a foreclosure action against Plaintiff and purported to make an assignment to the Defendant WELLS (see Notice of Trustee Sale Exhibit B).

76.     WELLS is not legally documented assignees of either the Plaintiff's Mortgage or Note and do not hold the original Mortgage nor have they ever held the Plaintiff's Note.

77.     No Note or other evidence exists which could ever make the Plaintiff indebted to WELLS in any way.

78.     Neither MERS, nor WELLS ever had nor will they ever have the authority to assign the Mortgage to any entity.

79.     WELLS never had any right to collect on the Note or enforce the Mortgage, nor have they ever had a right to hold, enforce or collect upon Plaintiff's Note.

80.     At the time Plaintiff signed the Note and Mortgage, he was unknowingly converting his property into an asset of a MBS and was deliberately induced into signing a Negotiable Instrument, which was never intended as such, but was intended as collateral for a MBS.

81.     The alleged Note in question started its life as a negotiable instrument, similar to a check. The negotiation and enforceability of the Note is governed by Article Three (3) of the Uniform Commercial Code.

82.     The note that had been executed with the Mortgage became part of a pool of mortgages losing its individual identity as a note between a lender and a borrower; it merged with other unknown notes as a total obligation due to the investor or investors; it is no longer a negotiable instrument, rather, collateral for a federally regulated Security under the confines of the SEC.

83.   In actuality, MERS was not the "nominee" for the lenders; the true lenders were investors who had provided the funds for the loans through mortgage backed security pools which were held as trusts.

84.   This fact was known to MERS and the Servicers and the subsequent assignees of any and all rights purported to have been assigned by MERS at the time the note and Mortgage was signed by Plaintiff and at the time of each and every later purported assignment by MERS, or others, of any interest in the note and Mortgage.

85.   The proper parties to this action would be the investors of the mortgage-backed securities to which Plaintiff's loan was securitized; but these parties have no recorded interest in the Mortgage, which were never delivered to the Trustee for the mortgage backed security pool; therefore the note itself is, at best, unsecured rights to payment.

86.   All Defendants knew that Plaintiff's loan was securitized or intended to be securitized prior to the preparation of the note and mortgage reflecting the loan.

87.   All of the purported Assignments and transfers were done by the Defendants without the required corporate resolution giving authority for that person to conduct such assignments and transfers.

88.   A "debt collector" under the statute is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

89.   Attorneys who regularly engage in debt collection or debt collection litigation are covered by the FDCPA and their litigation activities must comply with the requirements of that Act.

## COUNT I
### Violation of FDIC Consumer Protection Paragraph 19 (b) (2)
### (VIII)

90.    All preceding paragraphs are incorporated as though fully set forth herein.

91.    12 CFR Part 226 et seq. states in pertinent part "2. Selection of index values. The historical example must reflect the method by which index values are determined under the program.  If a creditor uses an average of index values or any other index formula, the history given should reflect those values.  The creditor should select one date or, when an average of single values is used as an index, one period and should base the example on index values measured as of that same date or period for each year shown in the history. A date or period at any time during the year may be selected, but the same date or period must be used for each year in the historical example.  For example, a creditor could use values for the Fifteen years shown in the example.

92.    Pursuant to this section, the lender must provide the borrower with historical index values when the loan is an adjustable rate loan and adjustments are based on an index.

93.    Plaintiff's loan is an adjustable loan and is based upon an index.

94.    Defendants failed to make such required disclosure to the Plaintiff thereby causing harm to Plaintiff.

### (DISCLOSURE VIOLATION PURSUANT TO 15 U.S.C. 1635, ET. SEQ.)

95.    All preceding paragraphs are incorporated herein as though fully set forth.

96.    The present case credit transaction is governed by the disclosure requirements of Title 15 USC§ 1635.

97.    The UCC 1 lien applies to the transaction under revised Article 9 and to Defendants, because lien rights on the property arose in favor of Defendants as a result of the transaction.

98.    Defendants failed and /or refused to meet the disclosure requirements of Revised Article 9 of the UCC, by not providing the notice required or filing it before during or immediately after the settlement, as mandated under the Article.

99.    Plaintiff is specifically in the class of persons this statute was designed to protect.

100.   As a direct, proximate, and foreseeable result of Defendants failure to provide proper notices, defendant is subject to loss of property and loss of use of property and other damages as a result of Defendants failure.

## COUNT III
### (DISCLOSURE VIOLATIONS, PURSUANT TO TITLE 12 CODE OF FEDERAL REGULATIONS SECTION 226, ET. SEQ.)

101.   All preceding paragraphs are incorporated herein as though fully set forth.

102.   The Federal Reserve Board Interpretation, Title 12 Code of Federal Regulations Part 226, Supplement I, Paragraph 23(a)(1), provides that in the present case the transaction is rescindable for reasons above and below stated.

103.   The disclosures made in relation to the consumer credit transaction were not presented in the manner required by law. Furthermore, the disclosures were not grouped together and were not segregated from everything else as required by Title 12 of Federal Regulations, Section 226.17(a)(1) and in this case were not given at all.

104.   Plaintiff is specifically in the class of persons this statute was designed to protect.

105.   As a direct, proximate, and foreseeable result of Defendants failure to provide proper notice/disclosure, defendant is subject to loss of property and loss of use of property and other damages as a result of Defendants failure.

## COUNT IV
### (RIGHT TO RECIND VIOLATIONS, PURSUANT TO TITLE 12 CODE OF FEDERAL REGULATIONS SECTION 226, ET. SEQ.)

106.   All preceding paragraphs are incorporated herein as though fully set forth.

107.   The right to rescind or cancel settlement documents was unsigned by both parties, and was not disclosed or given, as required by Title 12 Code of Federal Regulation, Section 226.18 et seq.

108. Plaintiff is specifically in the class of persons this statute was designed to protect.

109. As a direct, proximate, and foreseeable result of Defendants failure to provide proper notice/disclosure, defendant is subject to loss of property and loss of use of property and other damages as a result of Defendants failure.

## COUNT V
### (RIGHT TO CANCEL VIOLATIONS, PURSUANT TO TITLE 12 CODE OF FEDERAL REGULATIONS SECTION 226, ET. SEQ.)

110. All preceding paragraphs are incorporated herein as though fully set forth.

111. There was no separate form to cancel, as required by Title 12 Code of Federal Regulation, Section 226 et seq.

112. Plaintiff is specifically in the class of persons this statute was designed to protect.

113. As a direct, proximate, and foreseeable result of Defendants failure to provide proper notice/disclosure, defendant is subject to loss of property and loss of use of property and other damages as a result of Defendants failure.

## COUNT VII
### (DECEPTIVE GROUPING VIOLATIONS, PURSUANT TO TITLE 12 CODE OF FEDERAL REGULATIONS SECTION 226, ET. SEQ.)

114. All preceding paragraphs are incorporated herein as though fully set forth.

115. The interest disclosures were not given together with other information within the documents.

116. Plaintiff is specifically in the class of persons this statute was designed to protect.

117. As a direct, proximate, and foreseeable result of Defendants failure to provide proper notice/disclosure, defendant is subject to loss of property and loss of use of property and other damages as a result of Defendants failure.

## COUNT VIII
### (NO GOOD FAITH ESTIMATE VIOLATIONS, PURSUANT TO TITLE 12 CODE OF FEDERAL REGULATIONS SECTION 226, ET. SEQ.)

118. All preceding paragraphs are incorporated herein as though fully set forth.

119.    Plaintiff, as required by 12 Code of Federal Regulation, Section 226.18(c) and 12 USC 2601 et seq., received no good faith estimate copy.

120.    Plaintiff is specifically in the class of persons this statute was designed to protect.

121.    As a direct, proximate, and foreseeable result of Defendants failure to provide proper notice/disclosure, defendant is subject to loss of property and loss of use of property and other damages as a result of Defendants failure.

## COUNT IX
### (CONSUMER STATEMENT MISSING VIOLATIONS, PURSUANT TO TITLE 12 CODE OF FEDERAL REGULATIONS SECTION 226, ET. SEQ.)

122.    All preceding paragraphs are incorporated herein as though fully set forth.

123.    A statement that the consumer should refer to the appropriate contract document and clause for information about nonpayment, default, and the right to accelerate was not given, as required by Title 12 Code of Federal Regulation, Section 226.18(p).

124.    Defendant is specifically in the class of persons this statute was designed to protect.

125.    As a direct, proximate, and foreseeable result of Defendants failure to provide proper notice/disclosure, defendant is subject to loss of property and loss of use of property and other damages as a result of Defendants failure.

## COUNT X
### (DISCLOSURE VIOLATIONS, PURSUANT TO TITLE 15 U.S.C. SECTION 1601, ET. SEQ. AND REGULATION Z)

126.    All preceding paragraphs are incorporated herein as though fully set forth.

127.    Since this action was commenced, Defendants has continued and so continues to violate the Consumer Credit Protection Act, Title 15 United States Code, Section 1601 et seq., and Regulation Z, Title 12 Code of Federal Regulations, Part 226, which was adopted pursuant to such Act, by failing to properly make the disclosures required by the Act and Regulation Z, as herein after more particularly set forth.

128.    Plaintiff is specifically in the class of persons this statute was designed to protect.

129.   As a direct, proximate, and foreseeable result of Defendants failure to provide proper notice, Defendant is subject to loss of property and loss of use of property and other damages as a result of Defendants failure.

## COUNT XI
### (FAILURE TO DISCLOSE CALCULATION OF MORTGAGE BALANCE PURSUANT TO TITLE 12 CFR SECTION 226.4, ET. SEQ.)

130.   All preceding paragraphs are incorporated herein as though fully set forth.

131.   Defendants failed to disclose in or with the disclosure statements, because no disclosure statements were given, the amount of the balance to which the rate was applied and an explanation of how that balance was determined and further failed to disclose the fact that the balance is determined without first deducting all credits and payments made and payments as required by Title 12 Code of Federal Regulations, Section 226.4 et seq.

132.   Plaintiff is specifically in the class of persons this statute was designed to protect.

133.   As a direct, proximate, and foreseeable result of Defendants failure to provide proper acceleration notice, Defendant is subject to loss of property and loss of use of property and other damages as a result of Defendants failure.

## COUNT XII
### (FAILURE TO DISCLOSE ITEMIZATION OF CHARGES, PURSUANT TO TITLE 12 USC 2610 ET SEQ.)

134.   All preceding paragraphs are incorporated herein as though fully set forth.

135.   Defendants failed to disclose in or with the acceleration statement the amounts, itemized and identified by type, of charges other than finance charges debited to the account during the acceleration period as required by Title 12 Code of Federal Regulations, Section 226.21.

136.   Plaintiff is specifically in the class of persons this statute was designed to protect.

137.   As a direct, proximate, and foreseeable result of Defendants failure to provide proper notice, Defendant is subject to loss of property and loss of use of property and other damages as a result of Defendants' acts.

## COUNT XIII
## VIOLATIONS OF THE FAIR DEBT COLLECTIONS PRACTICES ACT
("FDCPA") 15 USC § 1692
Defendant WELLS

138.    All preceding paragraphs are incorporated herein as though fully set forth.

139.    Defendants misrepresented the character and legal status of the unlawful debt in violation of 15 USC 1692(e) (2), by sending false correspondence to Plaintiff and third persons and assisting in the filing of an unlawful foreclosure action in county court.

140.    Defendants threatened to take and did take actions that they could not legally take without the ruse and falsities committed upon the Plaintiff in violation of 15 USC 1692 (e) (5).

141.    Defendants engaged in conduct that disgraced the Plaintiff in violation of 15 USC 1692(e) (7) by sending false correspondence to Plaintiff and third persons and assisting in the filing of an unlawful foreclosure action in county court.

142.    Although Plaintiff disputed the alleged debt, Defendants communicated false credit information to others and failed to communicate that the debt was disputed, when it was disputed, in violation of 15 USC§1692(e)(8).

143.    Defendants stated numerous times that they were the lawful owners in interest of the debt or empowered to speak on behalf of the owner in interest, yet knew or should have known that they were not, and as such violated 15 USC 1692(e)(5).

144.    All Defendants engaged in unfair and deceptive means and attempts to collect the alleged debt in violation of 15 USC 1692 (f).

145.    Defendants attempted to collect the alleged debt in a manner and amount not authorized by the original MORTGAGE and Note in violation of 15 USC 1692(f)(1).

146.    Defendants threatened to unlawfully repossess the Plaintiff's property in violation of 15 USC 1692(f) (8).

147.    Plaintiff suffered actual damages from these violations.

148.   Pursuant to 15 USC 1692(k), Plaintiff are entitled to actual damages, statutory damages as set forth herein, and reasonable attorney fees and costs.

149.   Because the conduct of the Defendants was frequent and persistent and because the nature of the violations of the FDCPA were so egregious and because the FDCPA violations were a part of a deliberate scheme, Plaintiff are entitled to the maximum possible relief permitted under 15 USC 1692k(a).

## COUNT XIV.
## VIOLATIONS OF RESPA 12 U.S.C. 2601 ET SEQ.

150.   All preceding paragraphs are incorporated as though fully set forth herein.

151.   Defendants failed to timely inform Plaintiff of any alleged Appointments, Assignments and transfers of the mortgage in violation RESPA.

152.   Defendants failed to timely notify Plaintiff of any change of servicers.

153.   Plaintiff have previously made written demands to Defendants to show evidence of standing to claim a debt and Defendants have refused to evidence such standing.

## COUNT XV.
## SLANDER OF TITLE/PETITION TO QUIET TITLE
### (WELLS and PREMIER)

154.   Plaintiff incorporates by this reference each preceding paragraph of this Complaint as if set forth fully herein.

155.   The Defendants have knowingly and maliciously communicated, in writing, false statements that have the effect of disparaging the Plaintiff's title to property.  The Plaintiff has incurred special damage as a result.

156.   WELLS has no legally enforceable claim, interest or standing to sue as to the Note or Mortgage in question and the claim is a cloud on the Defendants' title and should be quieted under Arizona law.

157.   Plaintiff is the rightful owners of the subject property.

158.   Plaintiff is the legal titleholders of his property.

159.    WELLS  have knowingly and unlawfully caused a cloud to be recorded against the title of the Plaintiff's property and have caused to be sent notices of default and foreclosures, and have served and filed mortgage documents that claim an interest in the property of the Plaintiff.

160.    Any purported transfer of any interest in the Plaintiff's real estate was wrongful and invalid because the endorsements, assignments, foreclosures or purported foreclosures were invalid and were not conducted in accordance with the laws of Pennsylvania.

161.    WELLS, knew or should have known that such transfers were wrongful and invalid and the publication of an ownership interest in the Plaintiff's property is, therefore false.

162.    The recording of the mortgages published the information to third parties.

163.    Because of said wrongful publication of an ownership interest in the Plaintiff's property, Plaintiff have incurred damages and will continue to incur attorneys' fees and costs related to this litigation, in an amount to be proven at trial.

164.    Plaintiff seeks a declaratory judgment against Defendants stating that Defendants have violated Plaintiff's rights and that the Defendants had and have no right to hold mortgages in the name of WELLS and/or foreclose on the Plaintiff's property and that the Defendants are entitled to no further payments from the Plaintiff or recognition in Plaintiff's Title to his property.

165.    The Plaintiff are entitled to a reformation of these notes as unsecured notes or as partially or wholly discharged notes and a right to reformation of the contracts with the persons or entities who are owed obligations because of funding of the loans of the Plaintiff.

## COUNT XVII.
### NEGLIGENT SUPERVISION

175.    Plaintiff re-alleges and affirms each preceding paragraph of this Complaint and incorporates such as if alleged anew.

176.    Defendants had a duty of care to supervise the actions of their employees and agents.

177.     Defendant's employees and/or agents' actions, as alleged previously, were unlawful and violated Plaintiff's property rights.

178.     Defendants knew or should have known that their employees and/or agents were acting unlawfully.

179.     As a result of the Defendants' negligent supervision, Plaintiff was proximately injured by the unlawful acts of their employees and/or agents.

180.     An agency relationship exists between the individual defendants and the corporate defendants.

181.     The actions of the individual defendants were done on behalf of and at the direction of the corporate defendants and within the scope of their agency relationship.

182.     As a result of the actions of the individual defendants, the Plaintiffs' were injured.

## COUNT XVIII.
## COMMON LAW FRAUD AND INJURIOUS FALSEHOOD

183.     Plaintiff incorporate by this reference each paragraph of this Complaint as if set forth fully herein.

184.     The publicly filed false mortgage assignments enabled all of the Defendants to perpetrate the fraudulent foreclosure.

185.     All of the Defendants knew or should have known the material representations were false.

186.     The material representations to the Plaintiff were made so that the Court and the Plaintiff would believe that the Defendants had a legitimate claim in the property.  The Plaintiff relied on such and the Plaintiff was injured as a result with the facing of foreclosure litigation.

187.     Defendants fraudulently concealed their wrongdoings and prevented Plaintiff from discovering their cause of action.

188.    Plaintiff has been injured by the fraud by Defendants and has remained in ignorance of it without any fault or want of diligence or care on his part.

189.    Defendants made many misleading statements that the loan contained certain terms desirable to the consumer when it did not.

190.    Defendants' use of deceit or trickery caused Plaintiff to act to their disadvantage.

**WHEREFORE,** Plaintiff's demand judgment against the Defendants as follows:

1. Judgment against Defendants as Jointly and Severally Liable for all issues in excess of $1,000,000.00.

2. Costs and attorney's fees pursuant to 18 USC § 1964(c) and relevant Arizona Revised Statutes and common law;

3. Actual and statutory damages for violations of FDCPA pursuant to 15 §1692(k) and relevant Arizona law;

4. Costs and attorney's Fees pursuant to 15 USC §1692(k) and relevant Arizona law;

5. Rescission of the entire Mortgage and note amounting to clear title to property with fixtures as a result of the aforementioned, and

6. Damages for the Unfair and Deceptive Acts and Practices and;

7. Damages in the amount of three times the interest paid and clear title to the property stemming from the exorbitant interest, and

8. Judgment against Defendants for return of the down payment, and other payments, as well as interest on the above amount, and

9. Cost of litigation as provided in Title 15 United States Code, Section §1601 et. seq.,

10. Pre-Judgment and post judgment interest at the maximum rate allowable by law;

11. Compensatory damages;

12. Punitive damages as allowed by law;

13. Such other and further relief available under all applicable under state and federal laws and any relief the court deems just and appropriate;

**DEMAND FOR JURY TRIAL** pursuant to rule 38(a) of the F.R.C.P.
Plaintiff demands a jury trial as to all issues triable by a jury.


DATED: May 12, 2012


Scott Smith, *Plaintiff*

Janel Donnelley, *Plaintiff*
458 North New Haven Street
Mesa, Arizona 85260

## VERIFICATION

We Scott Smith and Janel Donnelley, declare as follows:

1. We are the Plaintiff in the above action;

2. We have personal knowledge of all matters regarding this case, including those set out in the foregoing Complaint, and if called upon to testify I would competently testify as to the matters stated herein.

3. We verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning and its planned activity are true and correct.

Executed: May 11, 2012.


_____
Scott Smith, Plaintiff

_____
Janel Donnelley, Plaintiff
458 North New Haven Street
Mesa, Arizona 85260

<u>EXHIBIT A</u>

OFFICIAL RECORDS OF

## Unofficial
## Document

Recording Requested By:
PREMIER FINANCIAL SERVICES,
INC.

And After Recording Return To:
PREMIER FINANCIAL SERVICES, INC.
8330 EAST HARTFORD DRIVE #101
SCOTTSDALE, ARIZONA 85255
Loan Number: 1700488290

Magnus Title Agency _____ [Space Above This Line For Recording Data] _____

2/2 20330·731      **DEED OF TRUST**

**MIN:** 1001769-1700488290-9

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11,
13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated   FEBRUARY 19, 2008   , together
with all Riders to this document.
**(B)** "Borrower" is   SCOTT SMITH AND JANEL DONNELLEY, HUSBAND AND WIFE

Borrower is the trustor under this Security Instrument.  Borrower's mailing address is   458 NORTH NEW
HAVEN STREET, MESA, ARIZONA 85205

**(C)** "Lender" is   PREMIER FINANCIAL SERVICES, INC.

Lender is a   ARIZONA CORPORATION                                              organized
and existing under the laws of   ARIZONA
Lender's mailing address is   8330 EAST HARTFORD DRIVE #101, SCOTTSDALE,
ARIZONA 85255

**(D)** "Trustee" is   TITLE SECURITY AGENCY

Trustee's mailing address is   3200 NORTH CENTRAL AVENUE #1270, PHOENIX,
ARIZONA 85012

**(E)** "MERS" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary under this Security
Instrument.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number
of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic e⚡Forms 800-649-1362
Form 3003 1/01 (rev. 6/02)                            Page 1 of 14                              www.docmagic.com

20080154004

(F) "Note" means the promissory note signed by Borrower and dated   FEBRUARY 19, 2008  .
The Note states that Borrower owes Lender   ONE HUNDRED FIFTY-SEVEN THOUSAND FIVE
HUNDRED AND 00/100          Dollars (U.S. $  157,500.00          ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
MARCH 1, 2038  .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under
the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are
to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☒ Planned Unit Development Rider |
| ☐ Balloon Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Second Home Rider |
| ☐ Condominium Rider | ☐ Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial
opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges
that are imposed on Borrower or the Property by a condominium association, homeowners association or similar
organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft,
or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or
magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any
third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or
destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in
lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note,
plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing
regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or
successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument,
"RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan"
even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that
party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and
assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic *eFrmms* 800-649-1362
Form 3003 1/01 (rev. 6/02)                     Page 2 of 14                             www.docmagic.com

20080154004

the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                        of                        MARICOPA                        :
[Type of Recording Jurisdiction]                        [Name of Recording Jurisdiction]
LOT 231, GREENFIELD PARK, ACCORDING TO BOOK 251 OF MAPS, PAGE 39,
AND CERTIFICATE OF CORRECTION RECORDED IN DOCUMENT NO.
83-0256542, RECORDS OF MARICOPA COUNTY, ARIZONA.
A.P.N.: 140-14-226

which currently has the address of   458 NORTH NEW HAVEN STREET
[Street]

MESA                        , Arizona                        85205    ("Property Address"):
[City]                                                [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:
1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

20080154004

obligated to apply such payments at the time such payments are accepted.  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds.  Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current.  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower.  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   Application of Payments or Proceeds.  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:  (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   Funds for Escrow Items.  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender

20080154004

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either:  (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)                    Page 5 of 14                    DocMagic 800-649-1362
www.docmagic.com

20080154004

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)                                   Page 6 of 14                    DocMagic eForms 800-649-1362
www.docmagic.com

20080154004

material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to, (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  **Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.  These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.  These

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)                                      Page 7 of 14

DocMagic *eFerms* 800-649-1362
www.docmagic.com

20080154004

agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."  Further:

(a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)  Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law.  These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction:  (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)                   Page 8 of 14                   DocMagic

20080154004

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)                    Page 9 of 14

DocMagic *eForms* 800-649-1362
www.docmagic.com

20080154004

specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note

20080154004

and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  Hazardous Substances.  As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.**  Borrower and Lender further covenant and agree as follows:

22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify:  (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.  The

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)                     Page 11 of 14

20080154004

notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Time of Essence. Time is of the essence in each covenant of this Security Instrument.

Unofficial Document

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)                    Page 12 of 14                    DocMagic ɛϝɔϼɔϻϻϩ 800-649-1362
                                                                              www.docmagic.com

20080154004

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security
Instrument and in any Rider executed by Borrower and recorded with it.

_Scott Smith_ _____ (Seal)
SCOTT SMITH                        -Borrower

_Janel Donnelley_ _____ (Seal)
JANEL DONNELLEY                    -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

Witness:                      Unofficial Document Witness:

_____         _____

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic ℮Ⓡℱℴℴℴℴ 800-649-1362
Form 3003 1/01 (rev. 6/02)                         Page 13 of 14                   www.docmagic.com

20080154004

——————————— [Space Below This Line For Acknowledgment] ———————————

State of Arizona

County of __MARICOPA__

    The foregoing instrument was acknowledged before me this __2/20/08__

by __SCOTT SMITH AND JANEL DONNELLEY__

_Ronnell Raborn_
(Seal)
RONNELL RABORN
Notary Public—Arizona
Maricopa County
Expires on 08/28/2009

Exp. 8-28-09

_Ronnell Raborn_
Signature of Person Taking Acknowledgment

_Escrow Officer_
Title

_____
Serial Number, if any

My commission expires: __8/28/09__

Unofficial Document

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)                Page 14 of 14                DocMagic DocMagic 800-649-1362
www.docmagic.com

20080154004

Loan Number: 1700488290

## PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this        19th        day of
FEBRUARY, 2008            , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date,
given by the undersigned (the "Borrower") to secure Borrower's Note to  PREMIER
FINANCIAL SERVICES, INC., AN ARIZONA CORPORATION
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

458 NORTH NEW HAVEN STREET, MESA, ARIZONA 85205
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other
such parcels and certain common areas and facilities, as described in

COVENANTS, CONDITIONS AND RESTRICTIONS OF RECORD

(the "Declaration"). The Property is a part of a planned unit development known as

GREENFIELD PARK HOMEOWNERS ASSOC
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent
entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the
uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS.  In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

A.  PUD Obligations.  Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation,
trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or
other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and
assessments imposed pursuant to the Constituent Documents.

B.  Property Insurance.  So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and
which provides insurance coverage in the amounts (including deductible levels), for the periods, and against
loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but
not limited to, earthquakes and floods, for which Lender requires insurance, then:  (i) Lender waives the
provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property
insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance
coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the
Owners Association policy.

COMPLAINT

20080154004

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Unofficial Document

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                                    Page 2 of 3

DocMagic *EForms* 800-649-1362
www.docmagic.com

39 | P a g e                    C O M P L A I N T

20080154004

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
SCOTT SMITH            -Borrower

_____ (Seal)
JANEL DONNELLEY        -Borrower

_____ (Seal)
                       -Borrower

_____ (Seal)
                       -Borrower

_____ (Seal)
                       -Borrower

_____ (Seal)
                       -Borrower

Unofficial Document

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                Page 3 of 3

DocMagic EForms 800-649-1362
www.docmagic.com

COMPLAINT

EXHIBIT B

COMPLAINT

OFFICIAL RECORDS OF

Unofficial
Document

9

Great American Title Agency

WHEN RECORDED MAIL TO:

**TIFFANY & BOSCO, P.A.**
Michael A. Bosco, Jr.
2525 East Camelback Road, Suite 300
Phoenix, Arizona 85016

FNMA
Title No: 21109921
FHA/VA No.: 1706612884

### NOTICE OF TRUSTEE'S SALE
#### File ID. #11-43148  Smith

Notice is hereby given that **Michael A. Bosco, Jr., Attorney at Law,** as trustee (or successor trustee, or substituted trustee), pursuant to the Deed of Trust which had an original balance of **$157,500.00** executed by **Scott Smith and Janel Donnelley, husband and wife, 458 North New Haven Street, Mesa, AZ 85205,** dated **February 19, 2008** and recorded on **02/21/2008** as Instrument No. **2008-0154004** (or Book, Page) of the Official Records of **Maricopa** County, AZ, will sell the real property described herein  by public auction on **January 20, 2012 at 10:00 A.M. at the office of Michael A. Bosco, Jr., 7720 North 16th Street, Suite 300, in the City of Phoenix, County of Maricopa, State of Arizona,** , to the highest bidder for cash (in the forms which are lawful tender in the United States and acceptable to the Trustee, payable in accordance with ARS 33-811A), all right, title, and interest conveyed to and now held by it under said Deed of Trust, in the property situated in said County and State and more fully described as:

Lot 231, GREENFIELD PARK, according to Book 251 of Maps, Page 39, and Certificate of Correction recorded in Document No. 83-0256542, records of Maricopa County, Arizona.

The street address/location of the real property described above is purported to be:

> **458 North New Haven Street**
> **Mesa, AZ  85205**
> **Tax Parcel No.: 140-14-226**

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.

The beneficiary under the aforementioned Deed of Trust has accelerated the Note secured thereby and has declared the entire unpaid principal balance, as well as any and all other amounts due in connection with said Note and/or Deed of Trust, immediately due and payable.

*(Notice of Sale continued following page ...…...)*

20110874767

*Page 2 of Notice of Trustee's Sale*
*File ID: 11-43148 Smith*

Said sale will be made in an "as is" condition, but without covenant or warranty, express or implied, regarding title, possession or encumbrances, to satisfy the indebtedness secured by said Deed of Trust, advances thereunder, with interest as provided therein, and the unpaid principal balance of the Note secured by said Deed of Trust with interest thereon as proved in said Note, plus fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust.

Current Beneficiary:
    Wells Fargo Bank, N.A.
Care of / Servicer
    Wells Fargo Home Mortgage Inc
    3476   Stateview   Boulevard,   MAC
#X7801-014
    Fort Mill, SC  29715

Current Trustee:
Michael A. Bosco, Jr.
2525 East Camelback Road, Suite 300
Phoenix, Arizona 85016
(602) 255-6035

Michael A. Bosco, Jr., Attorney at Law
Trustee/Successor Trustee, is regulated by and
qualified per ARS Section 33-803 (A)2 as a
member of The Arizona State Bar

STATE OF ARIZONA
COUNTY OF MARICOPA

On this 21st day of October, 2011 before me, Mary P. Dobos a Notary Public for said State, personally appeared Michael A. Bosco, Jr. personally known to me be (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

OFFICIAL SEAL
MARY P. DOBOS
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Oct. 22, 2014

Mary P. Dobos Notary Public
Commission expiration is 10/22/14

This firm is not a Debt Collector as that term is defined pursuant to the Fair Debt Collection Practices Act within this jurisdiction (*see Mansour vs. Cal-Western Reconveyance Corp.*, 618 F.Supp.2d 1178 (D. Ariz. 2009). Should a subsequent determination be made that this firm is a Debt Collector as that term is defined within the Act, then you are notified that any information obtained will be used for the purpose of collecting a debt. Please be advised that if your personal liability for this debt has been modified or extinguished by a discharge in bankruptcy, this communication is provided solely in reference to the foreclose on the deed of trust remaining on your property and is not an attempt to collect the discharged personal obligation. The notifications provided herein do not limit or detract from the effect of foreclosure upon the subject property.

NOTICE:  If the sale is set aside for any reason, the Purchaser at the sale shall be entitled only to a return of the deposit paid. The Purchaser shall have no further recourse against the Mortgagor, the Mortgagee or the Mortgagee's attorney.

COMPLAINT

EXHIBIT C

Unofficial
Document

Recording Requested By:
WELLS FARGO BANK, N.A.

When Recorded Return To:

DEFAULT ASSIGNMENT
WELLS FARGO BANK, N.A.
MAC: X9999-018
PO BOX 1629
MINNEAPOLIS, MN  55440-9790

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Maricopa, Arizona
SELLER'S SERVICING #:0207583725  "SMITH"
SELLER'S LENDER ID#: 846

MERS #: 1001769-1700488290-9  SIS #: 1-888-679-6377

Date of Assignment: August 3rd, 2011
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS
NOMINEE FOR PREMIER FINANCIAL SERVICES, INC., ITS SUCCESSORS AND
ASSIGNS at BOX 2026 FLINT MI 48501, 1901 E VOORHEES ST STE C., DANVILLE,
IL 61834
Assignee: WELLS FARGO BANK, NA at 1 HOME CAMPUS, DES MOINES, IA  50328

Executed By: SCOTT SMITH AND JANEL DONNELLEY, HUSBAND AND WIFE  To:
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR
PREMIER FINANCIAL SERVICES, INC., ITS SUCCESSORS AND ASSIGNS
Date of Deed of Trust:  02/19/2008 Recorded:  02/21/2008  as Instrument No.:
20080154004  In the County of Maricopa, State of Arizona.

   KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN
and NO/100ths DOLLARS and other good and valuable consideration, paid to the
above named Assignor, the receipt and sufficiency of which is hereby acknowledged,
said Assignor hereby assigns unto the above-named Assignee, the said Deed of Trust
having an original principal sum of $157,500.00 with interest, secured thereby, with all
moneys now owing or that may hereafter become due or owing in respect thereof, and
the full benefit of all the powers and of all the covenants and provisos therein
contained, and the said Assignor hereby grants and conveys unto the said Assignee,
the Assignor's beneficial interest under the Deed of Trust.

   TO HAVE AND TO HOLD the said Deed of Trust, and the said property unto the
said Assignee forever, subject to the terms contained in said Deed of Trust. IN
WITNESS WHEREOF, the assignor has executed these presents the day and year first
above written:

   MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR
PREMIER FINANCIAL SERVICES, INC., ITS SUCCESSORS AND ASSIGNS
On  8/ 4  /11

By:
   Stacey Pettus
Assistant  Secretary

*CF*CFWFEM*08/03/2011 10:27:41 PM* WFEM01WFEMA0000000000000000121758* AZMARIC* 0207583725 AZSTATE_TRUST_ASSIGN_ASSN **CFWFEM*

COMPLAINT

20110660797

CORPORATE ASSIGNMENT OF DEED OF TRUST Page 2 of 2

STATE OF Minnesota
COUNTY OF Dakota

On _8/ 4 /11_ , before me, _Julie Ann Prieto_ a Notary
Public in and for Dakota in the State of Minnesota, personally appeared
_____Stacey Pettus_____ , Assistant Secretary, personally known to me (or
proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity, and that by his/her/their
signature on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

WITNESS my hand and official seal,

> JULIE ANN PRIETO
> NOTARY PUBLIC
> MINNESOTA
> My Commission Expires Jan. 31, 2014

Notary Expires: 1/31/ 2014

(This area for notarial seal)

Unofficial Document

*CF*CFWFEM*08/03/2011 10:57:41 PM* WFEM01WFEMA000000000000000121758* AZMARIC* 6207583725 AZSTATE_TRUST_ASSIGN_ASSN **CFWFEM*

## PROOF OF SERVICE

**Delivery by U.S. Mail**:

I, Scott Smith, declare that on May 12, 2012, I served a copy of the Complaint, by placing a true copy in the United States via regular mail, enclosed in a sealed envelope with postage fully prepaid, addressed as follows:

WELLS FARGO BANK NATIONAL ASSOCIATION
101 N. PHILLIPS AVENUE
SIOUX FALLS, SD 57104

PREMIER FINANCIAL SERVICES INC
10115 E. BELL ROAD STE 107-450
SCOTTSDALE ARIZONA 85260

SCOTT SMITH



U.S. POSTAGE
PAID
MESA, AZ
85201
MAY 15, '12
AMOUNT
$2.70
00037271-23

458 N New Haven
Mesa, AZ 85205

US District Court of Iowa Southern District
123 E. Walnut St. #300
Des Moines, IA 50309